Filed 11/21/18

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D073266 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD270982) |
| NATHANIEL SHANE STUTELBERG, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Leo Valentine, Jr., Judge. Affirmed in part and reversed in part.

Ava R. Stralla, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Michael Pulos and Michael D. Butera, Deputy Attorneys General, for Plaintiff and Respondent.

After a heated exchange outside a bar, defendant Nathaniel Stutelberg jabbed a box cutter at Michelle S. and Chris L., lacerating Michelle's head but not injuring Chris. Among other things, the jury convicted Stutelberg of mayhem with a deadly weapon enhancement as to Michelle (Pen. Code, §§ 203, 12022, subd. (b)(1))[1] and assault with a deadly weapon as to Chris (§ 245, subd. (a)(1)). The sole issue on appeal is whether erroneous jury instructions defining a "deadly weapon" require reversal of either of Stutelberg's convictions.

As to the offense against Michelle, we conclude the instructional error was harmless beyond a reasonable doubt. We have no difficulty deciding from the record that the jury would have reached the same verdict but for the error. We reach a different result as to the crime involving Chris. Stutelberg's use of the box cutter in that encounter is more nebulous, and on the record before us we cannot conclude that the instructional error was harmless beyond a reasonable doubt. Accordingly, we reverse his conviction for assault with a deadly weapon in count 3 but otherwise affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

Stutelberg arrived at a bar one evening, intoxicated and wearing no shirt. He was yelling and arguing with the bouncer and assistant manager, who were denying him entry into the bar. A few minutes later, Stutelberg retreated from the bar but continued to yell at the bouncer and assistant manager while standing next to his friend's car. Michelle, a bar patron, approached the female passenger sitting in the parked car. She urged the

---

1    Further statutory references are to the Penal Code, unless otherwise indicated.

woman to take Stutelberg home to prevent police from being called. In response, the woman left the car and ran towards Michelle, who held out her right hand and told the woman to "back up."

Michelle's friend Chris and Missael O., a bar employee, walked toward Michelle. Stutelberg started "flicking" a box cutter toward their faces. Chris yelled that he saw a knife. Stutelberg swung a fist at Chris but missed. Michelle grabbed Stutelberg and pushed him into a light pole. Stutelberg punched Michelle and cut the back of her head with the box cutter.

The San Diego County District Attorney charged Stutelberg by amended information with aggravated mayhem against Michelle (§ 205, count 1), attempted aggravated mayhem against Chris (§§ 205, 664, count 2), assault with a deadly weapon against Chris (§ 245, subd. (a)(1), count 3), attempted aggravated mayhem against Missael (§§ 205, 664, count 4), and assault with a deadly weapon against Missael (§ 245, subd. (a)(1), count 5). Counts 1, 2, and 4 carried an enhancement for personal use of a deadly or dangerous weapon (§ 12022, subd. (b)(1)). All five counts were classified as "serious" felonies under section 1192.7, subdivision (c)(23) based on Stutelberg's alleged personal use of a deadly or dangerous weapon. Count 1 was additionally classified as a serious felony based on the allegation Stutelberg personally inflicted great bodily injury on Michelle (§ 1192.7, subd. (c)(8)).

The jury convicted Stutelberg of mayhem (§ 203), a lesser included offense of count 1 against Michelle and found true the deadly weapon enhancement and great bodily injury and deadly weapon allegations attached to that count. It also convicted him of

3

assault with a deadly weapon (§ 245, subd. (a)(1)) on count 3 against Chris, finding the deadly weapon allegation true.  It acquitted on counts 2, 4, and 5.

The court sentenced Stutelberg to a three-year prison term on count 1, consisting of the two-year low term plus a year for the deadly weapon enhancement.  It imposed a concurrent two-year low term sentence on count 3.

## DISCUSSION

To consider the assault with a deadly weapon charge in count 3 and the deadly weapon enhancement in count 1, the jury had to determine whether the box cutter Stutelberg used was a deadly weapon.  The court instructed jurors under CALCRIM No. 875, the assault instruction, in part that:

> "A *deadly weapon other than a firearm* is any object, instrument, or weapon that is inherently deadly or one that is used in such a way that it is capable of causing and likely to cause death or great bodily injury."

It also provided the jury with CALCRIM No. 3145 as to the enhancement, which contained similar language:

> "A *deadly or dangerous weapon* is any object, instrument, or weapon, that is inherently deadly or dangerous, or one that is used in such a way that it is capable of causing and likely to cause death or great bodily injury.  [¶]  In deciding whether an object is a deadly weapon, consider all the surrounding circumstances, including when and where the object was possessed and any other evidence that indicates whether the object would be used for a dangerous, rather than a harmless, purpose."

These instructions are flawed because they suggest the jury might properly conclude that a box cutter is inherently dangerous.  A box cutter, however, is not an inherently deadly weapon as a matter of law.  (*People v. McCoy* (1944) 25 Cal.2d 177,

4

188.) For the jury to properly find that Stutelberg used a deadly weapon under the facts of this case, it would have needed to rely on the second theory—that he used the box cutter in a way capable of causing and likely to cause death or great bodily injury.

The parties do not dispute that the inclusion of language regarding an "inherently deadly weapon" in CALCRIM No. 3145 was instructional error. Instead, they disagree on whether the error was prejudicial. That narrow question turns on a two-step inquiry: (1) whether the error was factual error or legal error; and (2) what prejudice standard applies.

As we explain, the instructional error in this case is legal in nature, and we therefore employ the traditional *Chapman* standard to evaluate prejudice. (*Chapman v. California* (1967) 386 U.S. 18 (*Chapman*).) Applying that standard to Stutelberg's convictions, we conclude the error was harmless as to his conviction in count 1 involving Michelle but prejudicial as to his conviction in count 3 involving Chris. Accordingly, we reverse the judgment of conviction as to count 3 and remand for further proceedings.

1.    *The instructions presented a legally (rather than factually) invalid theory*

As noted, the jury in this case should not have been instructed on an "inherently dangerous" weapon. The only weapon involved in the case was a box cutter, and it is *not* inherently dangerous as a matter of law. The threshold question is whether this error was factual or legal. Stutelberg contends the error was legal, whereas the People claim the error was factual. We conclude Stutelberg is correct.

A legal error is an incorrect statement of law, whereas a factual error is an otherwise valid legal theory that is not supported by the facts or evidence in a case.

5

(*People v. Guiton* (1993) 4 Cal.4th 1116, 1125 (*Guiton*).)  Between the two, legal error requires a more stringent standard for prejudice, for jurors are presumed to be less able to identify and ignore an incorrect statement of law due to their lack of formal legal training. (*Id.* at p. 1125, quoting *Griffin v. United States* (1991) 502 U.S. 46, 59.)  Factual errors, on the other hand, are less likely to be prejudicial because jurors are generally able to evaluate the facts of a case and ignore factually inapplicable theories.  (*Guiton*, at p. 1125, quoting *Griffin*, at p. 59.)

The People argue the error was factual because the jury was simply given otherwise correct instructions about a legal theory that was inapplicable to the facts of the case.  In other words, because a box cutter is not inherently dangerous, the jury was presented with a factually inapplicable theory even though the instruction may have been a correct statement of law in the abstract.

We disagree.  An "inherently deadly or dangerous" weapon is a term of art describing objects that are deadly or dangerous in "the ordinary use for which they are designed," that is, weapons that have no practical nondeadly purpose.  (*People v. Perez* (2018) 4 Cal.5th 1055, 1065.)  But the jurors were never provided with this definition, and they could reasonably classify a box cutter, which is sharp and used for cutting, as inherently dangerous based on the common understanding of the term.  This amounts to legal, rather than factual, error.

6

We agree with *People v. Aledamat* (2018) 20 Cal.App.5th 1149, review granted

July 5, 2018, S248105 (*Aledamat*), on this narrow issue.[2]  *Aledamat*, another case

involving a box cutter, concluded that an instruction defining "dangerous weapon" to

include an " 'inherently dangerous' " object presented "a *legally* (rather than *factually*)

invalid theory." (*Id.* at p. 1154.)  As the opinion persuasively reasons,

> "There was no failure of proof—that is, a failure to show through
> evidence that the box cutter is an 'inherently dangerous' weapon.
> Instead, a box cutter cannot be an inherently deadly weapon 'as a
> matter of law.'  [Citation.]  This is functionally indistinguishable
> from a situation in which a jury is instructed that a particular felony
> can be a predicate for felony murder when, as a matter of law, it
> cannot be." (*Ibid.*)[3]

2.    *We evaluate prejudice under the* Chapman *standard*

The parties agree that we apply the *Chapman* standard (*Chapman*, *supra*, 386 U.S.

at p. 24) to evaluate an instruction that improperly defines an element of a charged

offense.  (See *People v. Brown* (2012) 210 Cal.App.4th 1, 12–13 (*Brown*) [applying

*Chapman* to evaluate prejudice from an instruction allowing the jury to incorrectly

---

[2]    The Supreme Court granted review in *Aledamat* to address the appropriate
standard for evaluating prejudice resulting from legal error.  As we explain, although we
agree with *Aledamat* that the error was of a legal nature, we part ways in deciding the
appropriate standard for prejudice.  Pursuant to California Rules of Court, rule 8.1115,
subdivision (e)(1), we cite *Aledamat* solely for its persuasive value.

[3]    We disagree with the People's claim that this case is "strikingly similar" to *Guiton*,
*supra*, 4 Cal.4th 1116.  In *Guiton*, there was no risk the jury would have convicted on the
factually inapplicable theory that the defendant had *sold* cocaine.  Although the People
are correct that the jury was never instructed that a box cutter *was* an inherently deadly
weapon, it may have employed a common understanding of the term to rely on a legally
inapplicable theory.

7

classify a BB gun as an inherently deadly weapon].) The error here implicates Stutelberg's due process rights by lessening the prosecution's burden to prove an element of a crime. (See *People v. Harris* (1994) 9 Cal.4th 407, 438 ["jury instructions in a state criminal trial omitting the requirement of proof of every element of a crime *beyond a reasonable doubt* are erroneous under the Fourteenth Amendment's due process clause"].) Pursuant to *Chapman*, instructional error requires reversal unless it appears beyond a reasonable doubt that it did not contribute to the verdict. (*Harris*, at p. 424.)

Where the parties disagree is whether we evaluate the particular type of instructional error here under a *heightened Chapman* inquiry. Citing *Aledamat*, *supra*, 20 Cal.App.5th 1149, 1154, Stutelberg claims reversal is required absent an *affirmative showing* that no juror relied on the invalid theory. The People, in turn, maintain that *Aledamat* was wrongly decided. *Aledamat* is currently pending review on whether its *affirmative showing* standard is a proper interpretation of *Chapman*. Absent further guidance from the Supreme Court, we believe the traditional "harmless beyond a reasonable doubt" framework is the proper standard to apply.

As recently as 2017, the Supreme Court held that error in instructing on the elements of a crime is harmless "so long as the error does not vitiate *all* of the jury's findings" (*People v. Merritt* (2017) 2 Cal.5th 819, 829, 831 (*Merritt*), italics added), i.e., if "it is clear beyond a reasonable doubt that a rational jury would have rendered the same verdict absent the error." (*Id.* at p. 831.) The Supreme Court likewise recently held that instructing on an invalid legal theory may be harmless when " 'other aspects of the verdict or the evidence leave no reasonable doubt that the jury made findings necessary' " to

8

convict under a different, valid legal theory. (*In re Martinez* (2017) 3 Cal.5th 1216, 1226, quoting *People v. Chun* (2009) 45 Cal.4th 1172, 1205.) *Chun*, like many cases before it, utilized the traditional *Chapman* inquiry into whether an instructional error was harmless beyond a reasonable doubt. (*Chun*, at p. 1201; see *Neder v. United States* (1999) 527 U.S. 1, 4 ["A constitutional error is harmless when it appears 'beyond a reasonable doubt' that the error . . . did not contribute to the verdict obtained."]; see also *People v. Swain* (1996) 12 Cal.4th 593, 607 ["beyond a reasonable doubt" is the standard "traditionally applied to misinstruction on the elements of an offense"].) We believe this time-tested approach is appropriate here.[4]

As a practical matter, evidence regarding the effect of statements or events on the mental processes of a juror is inadmissible to impeach a verdict. (Evid. Code, § 1150, subd. (a).) To conclude as Stutelberg urges that *Chapman*, *supra*, 386 U.S. 18 requires an *affirmative showing* of how the jury reached its decision in this context would erect a nearly insurmountable barrier, creating in effect a rule of per se reversal. *Aledamat* recognized that the heightened version of the *Chapman* test it chose to employ was "arguably in tension with more recent cases" including the Supreme Court's decision in *Merritt*, *supra*, 2 Cal.5th 819. (*Aledamat*, *supra*, 20 Cal.App.5th at p. 1154.) The court

---

[4]     As the People explain, applying the usual *Chapman* standard does not necessarily conflict with *Guiton*. *Guiton* acknowledged that instructional error of a legal nature might be found harmless in certain cases, where "it is possible to determine from other portions of the verdict that the jury necessarily found the defendant guilty on the proper theory." (*Guiton*, *supra*, 4 Cal.4th at p. 1130.) Because that case dealt with factual rather than legal error, it left the appropriate standard of prejudice for the latter to "future cases." (*Id.* at p. 1131.)

believed, however, that this heightened standard was compelled by *Guiton*, *supra*, 4 Cal.4th 1116. For reasons we have explained (*ante*, fn. 4), we think *Guiton* intentionally reserved articulation of the precise standard for future cases. The language *Aledamat* treats as binding precedent (see 20 Cal.App.5th at p. 1154) was, at best, dicta. Guided by caselaw decided since *Guiton*, we choose to follow the traditional *Chapman* standard, which allows us to affirm where a review of the entire record demonstrates beyond a reasonable doubt that the error did not change the outcome.

3.    *Applying* Chapman *reveals harmless error as to count 1 but prejudice as to count 3*

The flawed deadly weapon instruction related to (1) the one-year deadly weapon enhancement for the mayhem charge (as to Michelle); and (2) the assault with a deadly weapon charge (as to Chris). Because the jury received different evidence and testimony as to each encounter, we must independently analyze prejudice as to each conviction.

a.    *Michelle* (*count 1*, *mayhem with a deadly weapon enhancement*)

The error was harmless as to the deadly weapon enhancement for the mayhem conviction. The evidence and testimony clearly indicated that Stutelberg sliced the back of Michelle's head from her left temple to the bottom of her hairline during a bar fight. After he swung at Chris but missed, Michelle pushed him into a light pole, sparking a physical altercation between Stutelberg and Michelle. Several witnesses testified that they saw him stab the back of Michelle's head with a box cutter. Stutelberg conceded using the box cutter to lacerate Michelle but claimed he did so in self-defense.

The error as to Michelle is similar to the one held harmless in *Brown*, *supra*, 210 Cal.App.4th 1. There, the court of appeal found that an improper jury instruction permitted the jury to convict the defendant of assault with a deadly weapon on the basis that the BB gun was "inherently dangerous," a lesser standard than "inherently deadly" as the CALCRIM instruction requires. (*Id.* at p. 11.) Nonetheless, the court ruled the error was harmless:

> "[T]here was ample evidence at trial Brown used the BB gun in a manner capable of inflicting and likely to inflict great bodily injury. That evidence, as well as the arguments of counsel, leave no reasonable doubt the jury found Brown guilty on this basis and not because it concluded the BB gun, regardless of the manner in which it was used, was 'inherently dangerous.' " (*Id.* at p. 13.)

The evidence and the arguments of counsel here likewise created no reasonable doubt as to whether the jury would decide Stutelberg used the box cutter as a deadly weapon against Michelle under the proper definition. Using a sharp box cutter to stab a victim's head undoubtedly qualifies as using the item "in such a way that it is capable of causing and likely to cause death or great bodily injury," as shown by the bodily injury that resulted. (*Brown*, *supra*, 210 Cal.App.4th at p. 11.) The wound bled, soaking Michelle's shirt. She required stitches and was still suffering from residual nerve damage at trial, roughly eight months after the incident.

The prosecutor's closing argument likewise did not suggest Stutelberg suffered any prejudice. As the parties agree, the prosecutor did not expressly refer to the "inherently deadly weapon" theory. Nor did his other statements invite the jury to classify the box cutter as inherently deadly. Stutelberg is correct that the prosecutor stated "personal use

11

of a deadly weapon" means that "when he committed the crime, he was armed with a razor blade."  But the prosecutor went on to discuss Stutelberg's use of the razor blade to "swipe" at the victims and to "slash open" Michelle's face.  The statements in their totality did not direct the jury to conclude the box cutter was inherently deadly by default; rather, they point to ample grounds for the jury to infer that Stutelberg used the box cutter to "swipe" and "slash open" victims in a manner likely to cause or causing injury.  Had the jury been provided only with the "deadly or dangerous as used" theory and not the inapplicable "inherently deadly weapon" theory, there is no reasonable probability it would have rejected the deadly weapon enhancement on count 1.  Therefore, the instructional error was harmless beyond a reasonable doubt.

        b.        *Chris* (*count 3, assault with a deadly weapon*)

We reach a different result as to Stutelberg's assault with a deadly weapon conviction in count 3 involving Chris.  Unlike Michelle, whom Stutelberg severely injured, Chris was not harmed.  Stutelberg "swung" at Chris but missed.  It is unclear which arm Stutelberg swung and if he was holding the box cutter in that same hand.  On cross-examination, Chris admitted that it "wasn't as though [Stutelberg] had a razor in his hand and he's jabbing at [his] face."  Although Missael testified that Stutelberg jabbed a box cutter at both Chris and him in a manner likely to cause great bodily injury, the jury apparently disbelieved his testimony, acquitting Stutelberg of assault with a deadly weapon against Missael.  The exact manner in which Stutelberg used the box cutter against Chris is thus unclear.  The jury could reasonably conclude that his "flicking" motion was more of a threat, as opposed to an act likely to cause death or great bodily

12

injury. Under these circumstances, we cannot say that the court's error in instructing the jury regarding an inherently dangerous weapon was harmless beyond a reasonable doubt.

The error is prejudicial for reasons similar to those found in *People v. Hudson* (2006) 38 Cal.4th 1002. There, the jury convicted the defendant of eluding a pursuing police officer, a crime requiring the officer's vehicle to be "distinctively marked." (*Id.* at p. 1006.) The jury, however, was not told that a "distinctively marked" police vehicle must have at least one additional police-like feature besides a red light and a siren. (*Id.* at p. 1013.) The Supreme Court reversed the conviction because the jury could have wrongly classified the police car as "distinctively marked" based solely on its light and siren. (*Id.* at p. 1014). Similarly, the flawed instruction in this case could have caused the jury to misclassify the box cutter as an "inherently" deadly weapon. Given the factual uncertainty as to whether Stutelberg used the box cutter in a manner likely to cause Chris serious physical injury, we cannot say beyond a reasonable doubt that a properly instructed jury would have found that Stutelberg necessarily used the box cutter in a deadly or dangerous manner. Accordingly, the conviction on count 3 must be reversed.[5]

---

5    Stutelberg suggests that reversal will require the trial court to recalculate certain fines and fees ordered at sentencing. These are issues for the trial court to address in the first instance following retrial, if any, on count 3. If the prosecution does not retry Stutelberg on count 3, or if he were acquitted on retrial, the court would need to recalculate the restitution fine (§ 1202.4, subd. (b)(1)), suspended parole revocation fine (§ 1202.45), victim restitution (§ 1202.4, subd. (f)), and levied fees (§ 1465.8; Gov. Code, § 70373) insofar as they are predicated on *two* felony convictions.

## DISPOSITION

The judgment of conviction as to count 3 is reversed and the matter is remanded for further proceedings consistent with this opinion, which may include retrial on count 3 and/or recalculation of applicable fines and fees.  In all other respects, the judgment is affirmed.


DATO, J.

WE CONCUR:


IRION, Acting P. J.


GUERRERO, J.

14